Filed 12/22/14  In re Ashley P. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ASHLEY P., et al., Persons Coming Under the Juvenile Court Law. | B257082 |
| | (Los Angeles County Super. Ct. No. CK85752) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent. | |
| v. | |
| CHRISTINA P., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Tony L. Richardson, Judge.  Affirmed.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Richard D. Weiss, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Stephen D. Watson, Deputy County Counsel for Plaintiff and Respondent.

Christina P. (mother) appeals from the juvenile court's judgment establishing dependency jurisdiction over her two children, Ashley P. (born November 1998) and Isabella P. (born April 2006), pursuant to Welfare and Institutions Code section 300.[1] Mother contends that substantial evidence does not support the juvenile court's jurisdictional findings as to her. We find mother's contentions unavailing and affirm.

## COMBINED FACTUAL AND PROCEDURAL HISTORY

**The family's prior history with DCFS**

The family consists of mother, Paul P. (father), and their two children, Ashley and Isabella. At the time of these proceedings, Ashley was 15 and Isabella was eight. The family previously came to the attention of the Department of Children and Family Services (DCFS) in August 2010, when mother physically assaulted Ashley by choking her with a piece of clothing. Mother was hospitalized as a danger to herself and others. Mother had been diagnosed with bipolar disorder and had failed to take her psychotropic medication. After the parents complied with court orders, the case was closed. The children were placed in father's physical custody with monitored visits for mother.

**Initial investigation of the current allegations**

On September 10, 2013, DCFS received a referral alleging that father was using methamphetamine in front of the children on a daily basis.

When a DCFS social worker interviewed Isabella at school on September 12, 2013, Isabella said she lived at home with father, her sister Ashley, and father's girlfriend. Isabella denied witnessing her father take drugs. When asked whether she visited with mother, Isabella replied "[n]ot that much." When asked why she did not visit with mother, Isabella replied "[b]ecause she's kind of sick." Isabella did not know what was wrong with mother. She could not recall the last time she visited with mother, but wished she could see her more often.

Ashley was interviewed on the same date at her school. Ashley admitted seeing father drink occasionally but never get drunk. Ashley further stated she was aware that

---

[1] All further statutory references are to the Welfare & Institutions Code.

father occasionally smoked marijuana, but that he did it far away from her and Isabella. She denied that father ever smoked marijuana in the home, and denied that father ever used any other drugs.

Ashley informed the social worker that mother has mental health issues which is why she and Isabella do not see much of mother. Maternal grandmother will typically call the girls to let them know when it's okay to visit mother. The last time Ashley visited mother was about three weeks prior to the interview. Mother was talking to herself in the middle of the night and Ashley was scared. Since then, Ashley did not want to visit mother. Mother had left her weird voice messages that did not make sense so Ashley preferred not to answer when mother called. Ashley said she usually feels comfortable visiting with mother because there are other adults in the home where mother lives, and because she knows she can call father at any time and he will pick them up if needed.

Mother was also interviewed, at the home of maternal grandmother (Margaret Y.) where mother resided with the children's aunt and uncle. Mother claimed that maternal grandmother was her sister-in-law, not the children's grandmother. However, the social worker had observed from prior DCFS records that Margaret Y. was the children's grandmother. Mother also insisted that the children's aunt and uncle were "Margaret's children" and not her siblings. While mother was able to hold a conversation, "her comments were sometimes scattered and not all of her information made sense."

The social worker asked mother about her mental health issues. Mother admitted to a diagnosis of "Schizo-Bipolar." However, mother was not in therapy. She stated that her domestic violence support group is like therapy, and indicated that she did not need therapy. Mother stated that she was taking Abilify and was medication compliant.

Father was interviewed in the family home and gave his belief that it was mother who called in the child abuse report. Father described mother as "out there." Father stated he has always been concerned about mother's mental health issues but he feels safe when the children visit mother because there are other maternal relatives in the home and Ashley has a cell phone to call in case of emergencies. The social worker confirmed with

3

father that Margaret Y. is mother's mother. When the social worker informed father that mother claimed that Margaret Y. was not her mother, father said, "[t]hat's how far off she is."

With regard to the allegations, father admitted to smoking a little marijuana every once in awhile, but never in front of the kids. He admitted to drinking one beer a day. However, he refused a drug test.

On September 18, 2013, the social worker interviewed Chimera Robinson, a psychiatric social worker who had been providing mother with therapy and case management services since June 2010. Robinson said mother typically visited monthly but had missed her August appointment. Robinson described mother as medication compliant but stated that maternal uncle recently reported that mother was not taking her medication and was in an abusive relationship. Maternal uncle also reported mother had been talking to herself and throwing things around the house. Maternal uncle stated that mother often leaves maternal grandmother's home when they are arguing and lives in her car.

On September 25, 2013, the social worker spoke to staff at the pulmonology department at Miller's Children's Hospital regarding Isabella, who had been a patient since 2010 and had been diagnosed with tracheoesophageal fistula reactive airway disease, tracheomalacia and recurrent pneumonia, which are pulmonary diseases involving the respiratory tract. At her last visit in December 2012, the doctor prescribed Isabella two medications to take daily until a specialist indicated she no longer needed the medication. However, Isabella missed her March 2013 appointment and had not been back since.

On September 27, 2013, mother informed DCFS that she was hospitalized voluntarily at a psychiatric hospital from September 14 to September 23, 2013. She claimed to have voluntarily admitted herself because she was feeling "really stressed" since she was working and going through so many personal issues. Mother said that she has been put on more medication and is now feeling better. The social worker noticed an

4

obvious difference in mother's speech and communication level. She seemed more focused and direct than when the social worker initially interviewed her.

In an interview on September 27, 2013 with father, he said that mother was recently hospitalized but was discharged and is "now back on her medication." Father said that when mother is on her medication, she's "cool" and "on top of it."

On October 1, 2013, two social workers visited the home. Father stated that the girls had visited mother over the weekend and came back with colds. The social worker observed Isabella to be wheezing and coughing due to preexisting respiratory conditions. The social worker advised father to take Isabella to the emergency room, which he eventually agreed to do. The social worker spoke briefly with Ashley who stated that everything is "fine" at home. When the social worker asked Ashley how her visit with mother went, Ashley stated that the visit was good and that mother was "doing a lot better." Ashley expressed her thought that mother was "taking her medication now." Maternal grandmother was home during the visit and watching over the children.

**Section 300 petition and detention**

On October 30, 2013, DCFS filed a section 300 petition on behalf of Ashley and Isabella based on mother's mental and emotional problems and father's drug use.

The petition contained eight counts, five of which were ultimately sustained by the juvenile court. The relevant counts were as follows: count b-1, alleging father's history of illicit drug use; count b-2, alleging that Isabella suffered from a medical condition and father failed to take her to scheduled doctor appointments; count b-4, alleging that mother's mental and emotional problems, including a diagnosis of bipolar disorder and a failure to take medications as prescribed, render her incapable of providing the children with regular care and support; count j-1, alleging that father's medical neglect of Isabella placed her sibling Ashley at risk; and count j-3, which contained identical allegations against mother as were found in count b-4.

On October 30, 2013, the juvenile court held an initial detention hearing where the court found a prima facie case that Ashley and Isabella were described by section 300.

The girls were released to father's care, monitored visits for mother were granted, family maintenance services ordered, and the matter was continued for adjudication.

**Jurisdiction/disposition report**

DCFS filed a jurisdiction/disposition report on December 11, 2013. Ashley was interviewed on November 18, 2013. She said mother "has psychosis and she takes three different kinds of medication. Sometimes she thinks she's better and will stop taking it." Father reported that the children do not always want to visit their mother because of how she acts when she does not take her medication regularly. However, mother stated she always took her medication and only did not attend one mental health appointment with Robinson because at the time she was in the hospital.

Mother admitted she has had "a lot" of psychiatric hospitalizations. She stated that the recent episode was caused by lack of sleep. The reason she could not sleep is that she sleeps in the living room where family members watch television.

DCFS recommended that the children be declared dependents of the court. It further recommended family maintenance services for father, and enhancement services for mother, including a psychiatric examination, individual counseling, and an order to adhere to her psychiatric regimen, including taking any and all prescribed medications.

**Adjudication**

The juvenile court adjudicated the petition on June 9, 2014. At the hearing, mother submitted a letter from the Los Angeles County Department of Mental Health, indicating that she continued to receive services for her bipolar disorder. The letter confirmed she had been consistent with her medical evaluation appointments, had been attending therapy sessions every four weeks, and had appeared stable with her behavior and mood.

At the hearing, mother testified that she had been diagnosed with bipolar disorder four years earlier and was taking Lithium, Abilify, and Ambien. She claimed that she had been taking the medication consistently since April 2011 but was "on and off" Abilify and had just started Lithium and Ambien. When asked why she was hospitalized in August 2013, mother explained that she was stressed and could not function properly

6

so she called 911 and asked to be taken to the hospital. Mother was hospitalized again in September 2013. She stated that if something like that happened again she would call father to pick up the girls if they were in her care.

DCFS argued that mother's failure to take her medication regularly placed the children at risk of harm, and that mother had a history of noncompliant behavior. Specifically, counsel for DCFS stated:

> "It does appear from mother's testimony that she seems to have a better handle on her mental illness and what's required of her. But based on what Ashley's statements are and based on the fact that we've been here now . . . several times in order to ensure that the girls are safe when they are visiting with the mother . . . [DCFS] does want to keep supervision on this mother to make sure that she can maintain this level of compliance over time."

Mother's counsel argued that mother was currently compliant with her medication and there was no evidence of risk to the children. Mother's counsel asked the court to dismiss both counts against mother.

The juvenile court sustained counts b-1, b-2, b-4, j-1, and j-3. As to mother, the court noted that there was recent evidence that mother occasionally stops taking her medication. The court also referenced mother's recent hospitalization, and noted that mother's circumstances had not changed since that incident. The court took note of father's opinion that the children should not be in the mother's care -- and do not want to be in the mother's care -- unless she is taking her medication.

As to father, the court noted that despite admitting to experimenting with drugs, father denied a drug abuse problem. In addition, father refused a drug test.

The juvenile court declared the children dependents of the court, placed them in father's custody, granted mother monitored visits, and ordered mother to receive enhancement and transportation services. Mother was ordered to participate in mental health counseling, undergo a psychiatric evaluation, take all prescribed psychotropic medications, and enroll in individual counseling to address case issues. The court set a six-month review hearing for December 8, 2014.

7

On June 10, 2014, mother filed her notice of appeal from the juvenile court's judgment of June 9, 2014.

## DISCUSSION

### I. Standard of review

We review the juvenile court's jurisdictional findings under the substantial evidence standard. (*In re David M.* (2005) 134 Cal.App.4th 822, 829; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) Under this standard, we review the record to determine whether there is any reasonable, credible, and solid evidence to support the juvenile court's conclusions. We resolve all conflicts in the evidence, and make all reasonable inferences from the evidence, in support of the court's orders. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393.)

### II. Justiciability

As DCFS points out, the juvenile court in this matter sustained counts against both mother and father. While mother challenges the sufficiency of the evidence as to her conduct, she makes no challenge as to the sufficiency of the evidence with respect to father's conduct.

"[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent. [Citations.]" (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 39.)

A similar situation occurred in the matter of *In re I.A.* (2011) 201 Cal.App.4th 1484. There, the father asked the court to review the evidentiary support only for the juvenile court's jurisdictional findings against him. The *I.A.* court explained:

> "Because he does not challenge the jurisdictional findings involving Mother's drug abuse, however, any decision we might render on the allegations involving Father will not result in a reversal of the court's order asserting jurisdiction. The juvenile court will still be entitled to assert jurisdiction over the minor on the basis of the unchallenged allegations. Further, the court will still be permitted to exercise personal jurisdiction over Father and adjudicate his parental rights, if any, since that jurisdiction is derivative of the court's jurisdiction over the minor and is unrelated to

Father's role in creating the conditions justifying the court's assertion of dependency jurisdiction.

"Under these circumstances, the issues Father's appeal raises are '"abstract or academic questions of law"' [citation], since we cannot render any relief to Father that would have a practical, tangible impact on his position in the dependency proceeding. Even if we found no adequate evidentiary support for the juvenile court's findings with respect to his conduct, we would not reverse the court's jurisdictional and dispositional orders nor vacate the court's assertion of personal jurisdiction over his parental rights."

(*In re I.A., supra*, 201 Cal.App.4th at p. 1492.)

While the father contended that the finding of jurisdiction could have other consequences for him beyond jurisdiction, the *I.A.* court noted "Father has not suggested a single specific legal or practical consequence from this finding, either within or outside the dependency proceedings." (*In re I.A., supra*, 201 Cal.App.4th at p. 1493.)

However, an appellate court may address the merits of the jurisdictional findings against one parent where "the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763). In contrast to *I.A.*, the *Drake M.* court decided to consider the merits of the father's appeal, stating:

"Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent. Such a distinction may have far-reaching implications with respect to future dependency proceedings in this case and father's parental rights. Thus, although dependency jurisdiction over Drake will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits."

(*In re Drake M., supra*, 211 Cal.App.4th at p. 763.)

Here, mother has failed to articulate a significant consequence resulting from the court's jurisdictional findings against her. Mother cites *In re Joshua C.* (1994) 24

9

Cal.App.4th 1544, 1548 for the general proposition that "[a]s the jurisdictional findings are the basis for the restrictive visitation and custody orders, error in the former undermines the foundation for the latter." However, mother was already restricted to monitored visitation with her daughters prior to this case -- the visitation and custody orders did not change. Therefore, we can offer mother no relief.

Mother also claims that the jurisdictional findings impacted the subsequent dispositional orders, as mother was ordered to engage in mental health services. (See *In re John S.* (2001) 88 Cal.App.4th 1140, 1143.) DCFS argues that mother was already engaging in mental health services, therefore mother suffered no prejudice. In response, mother argues that noncompliance with the court orders can lead to termination of services in the future, and theoretically to termination of mother's parental rights.

However, we note that mother does not make a specific substantive challenge to the juvenile court's dispositional order requiring her to participate in mental health services. Mother does not argue that this dispositional order was an abuse of the juvenile court's discretion for any reason. Therefore, the jurisdictional finding does not "serve[] as the basis for dispositional orders that are also challenged on appeal." (*In re Drake M., supra*, 211 Cal.App.4th at p. 762), and we need not review the jurisdictional finding for this reason.

In addition, mother has failed to show that the jurisdictional findings as to her "could be prejudicial to [her] or could potentially impact the current or future dependency proceedings." (*In re Drake M., supra*, 211 Cal.App.4th at p. 762.) Mother has admitted to mental health problems. Also, there was a previous dependency case concerning this family which confirmed mother's mental health problems and diagnosis of bipolar disorder. Mother has failed to provide any argument suggesting that the current jurisdictional findings as to her would have an impact on any future proceedings any more than would the previous findings.

The last consideration is whether the jurisdictional finding "'could have other consequences for [the appellant], beyond jurisdiction.'" (*In re Drake M., supra*, 211

Cal.App.4th at p. 763.) Mother makes no argument that it could have any such impact. Therefore we need not review the jurisdictional finding for this reason.

In sum, under the circumstances of this case, mother has failed to show any prejudice from the jurisdictional findings as to her, therefore we need not review them.

**III. The jurisdictional findings as to mother are supported by the evidence**

Even if mother had made the required showing of prejudice, requiring us to address the merits of her claim, we would find that substantial evidence supported the juvenile court's findings as to her.

Section 300, subdivision (b) permits the juvenile court to take jurisdiction over a child who is suffering, or is at risk of suffering, serious physical harm or illness resulting from the inability of the child's parent to supervise and protect her. (§ 300, subd. (b).) The statute specifies that jurisdiction is warranted if the parent is unable to "provide regular care for the child due to the parent's or guardian's mental illness." (*Ibid.*) The three elements for a section 300, subdivision (b) finding are: "'(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) "serious physical harm or illness" to the [child], or a "substantial risk" of such harm or illness.' [Citation.]" (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396, quoting *In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

The third element "effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future (e.g., evidence showing a substantial risk that past physical harm will reoccur.) [Citations.]" (*In re Savannah M., supra*, 131 Cal.App.4th at p. 1396.) Proof of current risk of harm at the time of the jurisdictional hearing is not required to support the initial exercise of jurisdiction under section 300, subdivision (b). The standard is met by a showing that the child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or abuse. (*In re Adam D.* (2010) 183 Cal.App.4th 1250, 1261.)

Here, DCFS alleged under count b- 4 that mother had mental and emotional problems, including a diagnosis of bipolar disorder, which rendered her incapable of providing the children with regular care and supervision. In addition, on prior occasions,

11

mother failed to take her medication regularly and failed to participate in psychiatric services. DCFS alleged that these mental and emotional problems placed the children at risk of harm.

The evidence in the record supported these allegations. Mother admitted to a diagnosis of bipolar disorder. In addition, in the family's previous dependency case the juvenile court made a finding that mother had a diagnosis of bipolar disorder. In the prior case, mother's failure to take her psychotropic medication as required led to an incident in which mother assaulted Ashley.

The evidence also supported DCFS's allegations that mother failed to take her medication regularly. Information from mother's therapist indicated that as recently as September 2013, mother was not taking her medication, had been talking to herself, and was throwing things around the house. Ashley also informed the social worker that mother had been talking to herself and leaving strange voicemail messages. Ashley stated directly that mother occasionally stopped taking her medication when she thought she was better. Father also said the children did not want to visit with mother when she was not taking her medication. This evidence from both Ashley and father suggests that mother's recent noncompliance with her treatment was not an isolated event.

In addition, mother's own behavior supported a finding that she was not consistently taking her medication. When the DCFS social worker first interviewed mother, her speech was scattered and nonsensical. She claimed that the people she was living with -- the children's maternal grandmother, aunt and uncle -- were not actually the maternal grandmother, aunt and uncle. Mother had a psychiatric hospitalization from September 14, 2013, through September 23, 2013, after which, according to father, "she was discharged and she's now back on her medication."

There was also evidence that mother was not participating in psychiatric services. When first interviewed, mother admitted that she was not participating in therapy. In fact, she claimed that she did not need it as her domestic violence support group "is like therapy." Mother's psychiatric social worker also told DCFS that mother had missed her August 2013 appointment.

Mother insists that at the time of the hearing, she was stable and engaging in treatment. Thus, she argues, there was insufficient evidence to find a risk of harm to the children. However, as we must, we view the evidence in a light most favorable to the juvenile court's action, accepting every reasonable inference that the court could have drawn from the evidence. (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) Under this standard, there was ample evidence to find a risk that mother might continue to engage in a pattern of noncompliance with her treatment program. This possibility of noncompliance put the girls at substantial risk of harm. Mother had physically assaulted Ashley on a prior occasion when she failed to take her medications as prescribed. In addition, the girls were fearful of mother when she failed to take her medication. They would not visit with mother unless the maternal grandmother indicated that "it's okay" to visit mother.[2]

*In re James R.* (2009) 176 Cal.App.4th 129, is distinguishable. In *James R.*, the mother was hospitalized after a one-time incident of drinking beer and consuming a large amount of ibuprofen while caring for her children. (*Id.* at p. 136.) The juvenile court asserted jurisdiction over the children, and the Court of Appeal reversed. The court found that while the mother had a history of mental instability, "she had not abused or neglected the minors in the past." (*Ibid.*) "'Without the history of abuse and neglect, it is nearly impossible to determine whether [the minors are] at risk of suffering from the same abuse and neglect.' [Citation.]" (*Ibid.*) Here, in contrast, there is a history of abuse and neglect. Mother had previously been adjudged incapable of caring for the children without supervision. In addition, she physically abused Ashley. In contrast to the situation in *James R.*, there is no need for speculation in this matter.

---

[2]    Mother also claims that there was no risk of harm to the children because mother did not have custody of the children. The record shows that while father had primary physical custody of the children, mother was entitled to monitored visitation. Mother cites nothing suggesting that a parent cannot present a risk to her children under these circumstances. Mother's incidents of violence and erratic behavior could certainly affect the children even in a monitored visit.

Sufficient evidence exists to support the juvenile court's finding that the children were at risk of suffering harm due to their mother's mental illness and inconsistent management of the illness. The juvenile court did not err in determining that the children were at substantial risk of harm at the time of the jurisdictional hearing, and that jurisdiction was warranted until such time as DCFS was satisfied that mother would continue to be compliant with her treatment.[3]

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

_____

[3]     The allegations against mother contained in count j-3 are identical to those found in count b-4 against mother. We need not separately address count j-3.